**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Ellen CAMPBELL, a/k/a
Ellen Campbell Fremin,
Defendant–Appellee.**

No. 91–5695.

United States Court of Appeals,
Fourth Circuit.

Argued June 5, 1992.

Decided Sept. 28, 1992.

Frank DeArmon Whitney, Asst. U.S. Atty., Thomas J. Ashcraft, U.S. Atty., Charlotte, N.C., argued (B. Frederic Williams, Jr., Asst. U.S. Atty., on brief), for plaintiff-appellant.

James Frank Wyatt, III, Charlotte, N.C., argued (Larry D. Tucker, on brief), for defendant-appellee.

Before ERVIN, Chief Judge, WILLIAMS, Circuit Judge, and MERHIGE, Senior District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

ERVIN, Chief Judge:

The United States appeals from the district court's grant of Ellen Campbell's motion for judgment of acquittal on charges of money laundering, 18 U.S.C. § 1956(a)(1)(B)(i), and engaging in a transaction in criminally derived property, 18 U.S.C. § 1957(a). *United States v. Campbell*, 777 F.Supp. 1259 (W.D.N.C.1991). Campbell had been convicted of the charges by a jury in the Western District of North Carolina. We reverse the judgment of acquittal, but affirm the district court's conditional grant of a new trial, and, accordingly, we remand the case for further proceedings.

## I.

The relevant facts are comprehensively set out in the district court's published opinion. *Id.* at 1260–62. We will only summarize them here. In the summer of 1989, Ellen Campbell was a licensed real estate agent working at Lake Norman Realty in Mooresville, North Carolina. During the same period, Mark Lawing was a drug dealer in Kannapolis, North Carolina. Lawing decided to buy a house on Lake Norman. He obtained Campbell's business card from Lake Norman Realty's Mooresville office, called Campbell, and scheduled an appointment to look at houses.

Over the course of about five weeks, Lawing met with Campbell approximately once a week and looked at a total of ten to twelve houses. Lawing and Campbell also had numerous phone conversations. Lawing represented himself to Campbell as the owner of a legitimate business, L & N Autocraft, which purportedly performed automobile customizing services. When meeting with Campbell, Lawing would travel in either a red Porsche he owned or a gold Porsche owned by a fellow drug dealer, Randy Sweatt, who would usually accompany Lawing. During the trips to look at houses, which occurred during normal business hours, Lawing would bring his cellular phone and would often consume food and beer with Sweatt. At one point, Lawing brought a briefcase containing $20,000 in cash, showing the money to Campbell to demonstrate his ability to purchase a house.

Lawing eventually settled upon a house listed for $191,000 and owned by Edward and Nancy Guy Fortier. The listing with the Fortiers had been secured by Sara Fox, another real estate agent with Lake Nor-

man Realty. After negotiations, Lawing and the Fortiers agreed on a price of $182,500, and entered into a written contract. Lawing was unable to secure a loan and decided to ask the Fortiers to accept $60,000 under the table in cash and to lower the contract price to $122,500.[1] Lawing contacted Campbell and informed her of this proposal. Campbell relayed the proposal to Fox, who forwarded the offer to the Fortiers. The Fortiers agreed, and Fox had the Fortiers execute a new listing agreement which lowered the sales price and increased the commission percentage (in order to protect the realtors' profits on the sale).

Thereafter Lawing met the Fortiers, Fox and Campbell in the Mooresville sales office with $60,000 in cash. The money was wrapped in small bundles and carried in a brown paper grocery bag. The money was counted, and a new contract was executed reflecting a sales price of $122,500. Lawing tipped both Fox and Campbell with "a couple of hundred dollars." *Id.* at 1261–62.

William Austin, the closing attorney, prepared closing documents, including HUD–1 and 1099–S forms, reflecting a sales price of $122,500, based on the information provided by Campbell. Campbell, Fox, Austin, Lawing, Lawing's parents and the Fortiers were all present at the closing. The closing documents were signed, all reflecting a sales price of $122,500.

Campbell was indicted on a three count indictment alleging: 1) money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); 2) engaging in a transaction in criminally derived property, in violation of 18 U.S.C. § 1957(a); and 3) causing a false statement (the HUD–1 form) to be filed with a government agency, in violation of 18 U.S.C. § 1001. She was tried and convicted by a jury on all three counts. After the verdict, the district court granted Campbell's mo-

tion for judgment of acquittal with respect to the money laundering and transaction in criminally derived property counts. The district court also conditionally ordered a new trial on these counts if the judgment of acquittal was reversed on appeal. The Government appeals.[2]

## II.

■ In reviewing a district court's grant of a post-verdict acquittal, this court must decide "whether, viewing the evidence in the light most favorable to the government, *any* rational trier of facts could have found the defendant guilty beyond a reasonable doubt." *United States v. Tresvant,* 677 F.2d 1018, 1021 (4th Cir. 1982). Because the question is a matter of law, we review the issue *de novo* and need accord no deference to the district court's determination that the evidence is insufficient. *United States v. Steed,* 674 F.2d 284, 286 (4th Cir.), *cert. denied,* 459 U.S. 829, 103 S.Ct. 67, 74 L.Ed.2d 68 (1982).

The money laundering statute under which Campbell was charged applies to any person who:

knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ... knowing that the transaction is designed in whole or in part ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity....

18 U.S.C. § 1956(a)(1). The district court found, and Campbell does not dispute, that there was adequate evidence for the jury to find that Campbell conducted a financial transaction which in fact involved the proceeds of Lawing's illegal drug activities.

---

1. Lawing's explanation to Campbell of this unorthodox arrangement was that the lower purchase price would allow Lawing's parents to qualify for a mortgage. Lawing would then make the mortgage payments on his parent's behalf. Lawing justified the secrecy of the arrangement by explaining that his parents had to remain unaware of the $60,000 payment be-

cause the only way he could induce their involvement was to convince them he was getting an excellent bargain on the real estate.

2. Campbell does not appeal her conviction for causing a false statement to be filed with a government agency.

The central issue in contention is whether there was sufficient evidence for the jury to find that Campbell possessed the knowledge that: (1) Lawing's funds were the proceeds of illegal activity, and (2) the transaction was designed to disguise the nature of those proceeds.

In assessing Campbell's culpability, it must be noted that the statute requires actual subjective knowledge. Campbell cannot be convicted on what she objectively should have known. However, this requirement is softened somewhat by the doctrine of willful blindness. In this case, the jury was instructed that:

> The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed her eyes to what would otherwise have been obvious to her. A finding beyond a reasonable doubt of a conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred upon willful blindness to the existence of a fact.

> It is entirely up to you as to whether you find any deliberate closing of the eyes and inferences to be drawn from any evidence. A showing of negligence is not sufficient to support a finding of willfulness or knowledge.

> I caution you that the willful blindness charge does not authorize you to find that the defendant acted knowingly because she should have known what was occurring when the property at 763 Sundown Road was being sold, or that in the exercise of hindsight she should have known what was occurring or because she was negligent in failing to recognize what was occurring or even because she was reckless or foolish in failing to recognize what was occurring. Instead, the Government must prove beyond a reasonable doubt that the defendant purposely and deliberately contrived to avoid learning all of the facts.

J.A. at 495–96. Neither party disputes the adequacy of these instructions on willful blindness or their applicability to this case. *See, e.g., United States v. Cogdell,* 844 F.2d 179, 181 (4th Cir.1988).

■ As outlined above, a money laundering conviction under section 1956(a)(1)(B)(i) requires proof of the defendant's knowledge of two separate facts: (1) that the funds involved in the transaction were the proceeds of illegal activity; and (2) that the transaction was designed to conceal the nature of the proceeds. In its opinion supporting the entry of the judgment of acquittal, the district court erred in interpreting the elements of the offense. After correctly reciting the elements of the statute, the court stated, "in a prosecution against a party other than the drug dealer," the Government must show *"a purpose of concealment"* and "knowledge of the drug dealer's activities." *Campbell,* 777 F.Supp. at 1265. (emphasis added). This assertion misstates the Government's burden. The Government need not prove that the defendant had the *purpose* of concealing the proceeds of illegal activity. Instead, as the plain language of the statute suggests, the Government must only show that the defendant possessed the *knowledge* that the transaction was designed to conceal illegal proceeds.[3]

This distinction is critical in cases such as the present one, in which the defendant is a person other than the individual who is the source of the tainted money. It is clear from the record that Campbell herself did not act with the purpose of concealing drug proceeds. Her motive, without question, was to close the real estate deal and collect the resulting commission, without regard to the source of the money or the effect of the transaction in concealing a portion of the purchase price. However, Campbell's motivations are irrelevant. Under the terms of the statute, the relevant question

---

**3.** The other portion of the district court's statement, that the Government must show Campbell possessed "knowledge of the drug dealer's activities," is also incorrect. The statute requires only a showing that the defendant had knowledge that "the property involved in a financial transaction represents the proceeds of *some form of illegal activity.*" 18 U.S.C. § 1956(a)(1) (emphasis added). This issue is addressed *infra* p. 858–59.

is not Campbell's purpose, but rather her knowledge of Lawing's purpose.[4]

The sufficiency of evidence regarding Campbell's knowledge of Lawing's purpose depends on whether Campbell was aware of Lawing's status as a drug dealer. Assuming for the moment that Campbell knew that Lawing's funds were derived from illegal activity, then the under the table transfer of $60,000 in cash would have been sufficient, by itself, to allow the jury to find that Campbell knew, or was willfully blind to the fact, that the transaction was designed for an illicit purpose. *See United States v. Massac*, 867 F.2d 174, 177–78 (3rd Cir.1989) (knowledge that funds were drug-related, coupled with irregular nature of financial transactions, sufficient to permit jury to infer defendant's knowledge of the purpose of such transactions); *see also United States v. Isabel*, 945 F.2d 1193, 1202–03 (1st Cir. 1991). Only if Campbell was oblivious to the illicit nature of Lawing's funds could she credibly argue that she believed Lawing's explanation of the under the table transfer of cash and was unaware of the money laundering potential of the transaction. In short, the fraudulent nature of the transaction itself provides a sufficient basis from which a jury could infer Campbell's knowledge of the transaction's purpose, if, as assumed above, Campbell also knew of the illegal source of Lawing's money.[5] As

a result, we find that, in this case, the knowledge components of the money laundering statute collapse into a single inquiry: Did Campbell know that Lawing's funds were derived from an illegal source?

The Government emphasizes that the district court misstated the Government's burden on this point as well, by holding that the Government must show Campbell's "knowledge of the drug dealer's activities." *Campbell*, 777 F.Supp. at 1265. As the text of the statute indicates, the Government need only show knowledge that the funds represented "the proceeds of some form of unlawful activity." 18 U.S.C. § 1956(a)(1); *see also* 18 U.S.C. § 1956(c)(1) (money laundering provision requires "that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of [specified unlawful] activity"). Practically, this distinction makes little difference. All of the Government's evidence was designed to show that Campbell knew that Lawing was a drug dealer. There is no indication that the jury could have believed that Lawing was involved in some form of criminal activity other than drug dealing. As a result, the district court's misstatement on this point is of little consequence.

The evidence pointing to Campbell's knowledge of Lawing's illegal activities is

---

**4.** We have no difficulty in finding that *Lawing* s purpose satisfied the statutory requirement that the transaction be "designed in whole or in part ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity...." 18 U.S.C. § 1956(a)(1)(B). The omission of $60,000 from all documentation regarding the sales price of the property clearly satisfies this standard—concealing both the nature and the location of Lawing's illegally derived funds. *See United States v. Lovett*, 964 F.2d 1029, 1034 (10th Cir.1992) (money laundering transaction need not necessarily conceal the *identity* of the participants in the transaction; concealment of the funds themselves is sufficient), *petition for cert. filed*, June 22, 1992. Accordingly, we need not address the Government's alternative argument that Lawing concealed ownership of the funds by placing title to the Lake Norman property in the name of his parents.

**5.** In this respect the present case is completely distinguishable from the principal case relied upon by the district court, *United States v. Sanders*, 929 F.2d 1466 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991). In that case, the court overturned two money laundering convictions of a defendant who, with funds admittedly derived from an illegal source, had purchased two automobiles. Unlike the present case, there was nothing irregular about the transactions themselves. The court found the transactions to be devoid of any attempt "to conceal or disguise the source or nature of the proceeds" and found that application of the money laundering statute to "ordinary commercial transactions" would "turn the money laundering statute into a 'money spending statute,'" a result clearly not intended by Congress. *Id.* at 1471–72. The present case, by contrast, presents a highly irregular financial transaction which, by its very structure, was designed to mislead onlookers as to the amount of money involved in the transaction.

not overwhelming. First, we find that the district court correctly excluded from consideration testimony by Sweatt that Lawing was a "known" drug dealer. Kannapolis, where Lawing's operations were located, is approximately fifteen miles from Mooresville, where Campbell lived and worked, and, as the district court pointed out, there was no indication that Lawing's reputation extended over such an extensive "community." *Id.* at 1266.

However, the district court also downplayed evidence that we find to be highly relevant. Sara Fox, the listing broker, testified at trial that Campbell had stated prior to the sale that the funds "may have been drug money." J.A. at 201. The trial court discounted this testimony because it conflicted with Fox's grand jury testimony that she did not recall Campbell ever indicating that Lawing was involved with drugs. *See Campbell*, 777 F.Supp. at 1266–67. In evaluating the testimony in this manner, the trial court made an impermissible judgment on witness credibility—a judgment that was clearly within the exclusive province of the jury. When ruling on a motion for judgment of acquittal the district court is obligated to weigh the evidence in the light most favorable to the Government. Under that standard, Fox's testimony regarding Campbell's statement that the funds "may have been drug money" should have been accepted as completely true.

In addition, the Government presented extensive evidence regarding Lawing's lifestyle. This evidence showed that Lawing and his companion both drove new Porsches, and that Lawing carried a cellular phone, flashed vast amounts of cash, and was able to be away from his purportedly legitimate business for long stretches of time during normal working hours. The district court conceded that this evidence "is not wholly [sic] irrelevant" to Campbell's knowledge of Lawing's true occupation, *id.* at 1267, but noted that Lawing's lifestyle was not inconsistent with that of many of the other inhabitants of the affluent Lake Norman area who were not drug dealers. *Id.* at 1265–66. Again, we find that the district court has drawn inferences from the evidence which, while possibly well-founded, are not the only inferences that can be drawn. It should have been left to the jury to decide whether or not the Government's evidence of Lawing's lifestyle was sufficient to negate the credibility of Campbell's assertion that she believed Lawing to be a legitimate businessman.

We find that the evidence of Lawing's lifestyle, the testimony concerning Campbell's statement that the money "might have been drug money," and the fraudulent nature of the transaction in which Campbell was asked to participate were sufficient to create a question for the jury concerning whether Campbell "deliberately closed her eyes to what would otherwise have been obvious to her." As a result, we find that a reasonable jury could have found that Campbell was willfully blind to the fact that Lawing was a drug dealer and the fact that the purchase of the Lake Norman property was intended, at least in part, to conceal the proceeds of Lawing's drug selling operation. Accordingly, we reverse the judgment of acquittal on the money laundering charge.

## III.

■ The statute under which Campbell was charged in Count 2 provides:

> Whoever ... knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

18 U.S.C. § 1957(a). The parties do not dispute that Campbell engaged in a monetary transaction in property of a value in excess of $10,000 or that the property was derived from "specified unlawful activity" as defined by the statute. Once again, the dispositive question is whether Campbell knew that Lawing's funds were the proceeds of criminal activity. As such, the discussion above with regard to the money laundering charge is completely applicable here. Because a jury could reasonably find that Campbell knew of, or was willfully

blind to, Lawing's true occupation, it was error for the district court to grant a judgment of acquittal on this count as well.

## IV.

 Finally, the district court conditionally granted Campbell's motion for a new trial, pursuant to Federal Rule of Criminal Procedure 33, "should the entry of a judgment of acquittal be reversed on appeal." *Campbell,* 777 F.Supp. at 1268. This court has held:

> Rule 33 allows a district court to grant a new trial in the interest of justice. When the motion attacks the weight of the evidence, the court's authority is much broader than when it is deciding a motion to acquit on the ground of insufficient evidence. In deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government. Thus, it may evaluate the credibility of the witnesses. When the evidence weighs so heavily against the verdict that it would be unjust to enter judgment, the court should grant a new trial.

*United States v. Arrington,* 757 F.2d 1484, 1485 (4th Cir.1985) (citations omitted). This court reviews such determinations for abuse of discretion. *Id.* at 1486. In this case, the district court's grant of a new trial cannot be considered to be an abuse of discretion. As noted above, the district court's primary error in evaluating the motion for judgment of acquittal was to draw inferences, unfavorable to the Government, from the evidence. In determining the necessity of a new trial, such inferences are allowed. Given the reasons stated in the district court's opinion, we cannot find the grant of a new trial on Counts 1 and 2 to be an abuse of discretion.[6]

We find no merit in Campbell's argument, raised by a separate Motion to Dismiss, that the result reached in this case,

reversal of the judgment of acquittal and affirmance of the grant of a new trial, is precluded by the Double Jeopardy Clause of the United States Constitution. In *Tibbs v. Florida,* 457 U.S. 31, 42, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652 (1982), the Supreme Court held that a successive prosecution was not violative of the Double Jeopardy Clause when, as here, a new trial had been granted because of a judicial finding that the previous conviction was contrary to the weight of the evidence. That principle is unaffected by the fact that, in this case, the district court coupled the grant of a new trial with the erroneous entry of a judgment of acquittal. Having reversed the judgment of acquittal, we must evaluate the grant of a new trial as if the judgment of acquittal had never been entered. Under the authority of *Tibbs,* subjecting Campbell to a new trial on the money laundering and transacting in criminally derived property charges does not violate the Double Jeopardy Clause. *See also United States v. Dixon,* 658 F.2d 181, 187 (3rd Cir.1981) ("If appellee is retried following our reinstatement of the verdict, it will be the result of his own motion for a new trial, and not a process imposed upon him by the Government or this court.").

## V.

The district court's entry of judgment of acquittal on Counts 1 and 2 is hereby reversed. The conditional grant of a new trial on these counts is affirmed.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

6. In opposing the grant of a new trial, the Government addresses each of the reasons advanced by the district court and argues that, individually, none of those reasons is an appropriate ground for granting a new trial. While we recognize that the Government's arguments

have some merit, we interpret the district court's ruling as a finding that the verdict was against the cumulative weight of the evidence. This is a proper ground upon which to grant a new trial, and we do not find the district court's determination to be an abuse of discretion.