7 F.3d 227
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles OGLESBY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ernest GRANT, Defendant-Appellant.
 Nos. 92-5641, 93-5019.
 No. 93-5019.
 United States Court of Appeals,
Fourth Circuit.
 Argued: July 15, 1993.
Decided: September 29, 1993.
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore. John A. Hargrove, District Judge; Herbert N. Maletz, Senior Judge, sitting by designation. (CR-91-357-HAR)
 Anton James Sean Keating, Baltimore, Maryland, for Appellant Grant; Gregory Lee Andrew Thomas, Washington, D.C., for Appellant Oglesby.
 Debra Ann Carr, Assistant United States Attorney, Baltimore, Maryland, for Appellee.
 Gary P. Jordan, United States Attorney, Baltimore, Maryland, for Appellee.
 D.Md.
 AFFIRMED.
 Before WILKINS, NIEMEYER, and HAMILTON, Circuit Judges.
 PER CURIAM:
 
 OPINION
 
 1
 Ernest Grant and Charles Oglesby were convicted by a jury of conspiracy to distribute and to possess with intent to distribute heroin, in violation of 21 U.S.C. § 846, and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Grant was sentenced to 46 months imprisonment and Oglesby, to 33 months. As their principal ground for appealing, they contend that the evidence produced at trial was insufficient to support their convictions. They also contend they are entitled to a new trial because of newly discovered evidence and because the district court improperly admitted evidence under Federal Rule of Evidence 404(b). For the reasons that follow, we affirm.
 
 
 2
 * Both Grant and Oglesby challenge the sufficiency of the evidence supporting their convictions. To succeed on this ground they must demonstrate that, viewing the evidence in the light most favorable to the government, no rational trier of facts could have found them guilty beyond a reasonable doubt. See United States v. Giunta, 925 F.2d 758, 764 (4th Cir. 1991) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Circumstantial as well as direct evidence must be considered and the government must be allowed the benefit of all reasonable inferences from the facts proven. See United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982).
 
 
 3
 On the substance of the charges, to sustain a conspiracy conviction the government bears the burden of proving beyond a reasonable doubt that the defendant knew of the conspiracy's purpose and engaged in some action that indicates his participation. See United States v. Brooks, 957 F.2d 1138, 1147 (4th Cir.), cert. denied, 112 S. Ct. 3051 (1992). The defendant's participation may be proved with evidence of only a slight connection between him and the conspiracy, and it is not necessary to demonstrate that the defendant had knowledge of the details of the overall conspiracy. In other words, he may be convicted despite having played only a minor role in the conspiracy. Id.
 
 
 4
 To sustain a money laundering conviction under 18 U.S.C. § 1956(a)(1)(B)(i), the government bears the burden of proving beyond a reasonable doubt that (1) the defendant conducted a financial transaction affecting interstate commerce which involved the proceeds of specified unlawful activity; (2) the defendant did so knowing that the transaction was designed in whole or in part to disguise the nature, the source, the ownership, or the control of the proceeds; and (3) the defendant knew that the property involved in the transaction was derived from unlawful activity. See United States v. Baker, 985 F.2d 1248, 1252 (4th Cir. 1993). The requirement of showing that the defendant knew of the transaction's purpose is satisfied by evidence that the defendant either knew, or was "willfully blind to the fact, that the transaction was designed for an illicit purpose." United States v. Campbell, 977 F.2d 854, 858 (4th Cir. 1992) (citation omitted), cert. denied, 113 S.Ct. 1331 (1993).
 
 
 5
 We now turn to consider the evidence presented in the light of these legal principles.
 
 A. Ernest Grant
 
 6
 Hayward Walker, a conspirator and government informant, testified that in October 1990 he introduced Grant, an accountant, to Allen Smallwood, who at the time was engaged in illegal drug trafficking, and to Smallwood's partner, Kenneth Terry. Subsequently, Grant began performing accounting services for Smallwood and Terry. As their accountant he was also engaged to help the two men purchase a building, purportedly to be used for a retail sporting goods store. At the time Smallwood and Terry were not employed.
 
 
 7
 Walker testified further that it was a practice of Smallwood and Terry to conceal their drug proceeds by purchasing expensive cars and that in October or November 1990 Grant purchased a 1990 BMW for Smallwood. Walker also reported a conversation with Grant in which Grant stated that he was present with Smallwood and others when "they had a shoot out" over "a territorial beef." The incident took place before Grant purchased the BMW for Smallwood.
 
 
 8
 Special Agent Wilbur Plummer testified to being present at a meeting on November 14, 1990, at Pargo's Restaurant which included Grant, Smallwood, Terry, and Walker. A subject of discussion at the meeting was the purchase by Terry and Smallwood of a shopping center for $400,000 in cash. The purpose of the transaction was "to launder the money." Agent Plummer, who was undercover, stated that during the conversation it became clear that the source of the $400,000 was drug sales. Smallwood talked of "buying footballs" (slang for a kilogram of heroin) from a source, Jerome Onwuazor, for $175,000, and, as also related to Agent Plummer,"Allen Smallwood was telling us that they were drug dealers, that that is the reason why they wanted to buy the shopping center, but they couldn't do the shopping center themselves, but they hired this accountant," referring to Grant. Agent Plummer said that Grant was at the table during all of these discussions at Pargo's Restaurant and participated.
 
 
 9
 While there was no evidence that Grant actually discussed drugs or participated in actual drug transactions, the evidence was sufficient to support the convictions based on his role in the purchase of the BMW. A reasonable jury could have inferred from these facts that the BMW was purchased with money derived from the distribution of drugs, that Grant participated in the transaction knowing or willfully blind to the fact that it involved drug proceeds, and that he further understood that the purpose of the transaction was to conceal the money's illegal nature. In addition, the testimony concerning the later meeting on November 14 at Pargo's Restaurant also established Grant's knowledge of and role in the illegal drug conspiracy. See United States v. Corbin, 734 F.2d 643, 652 (11th Cir. 1984) ("Once it is demonstrated that a defendant joins an ongoing conspiracy with knowledge of its general purpose and scope, he is bound by all that has gone on before in the conspiracy, even if it is unknown to him") (citations omitted).
 
 B. Charles Oglesby
 
 10
 The evidence presented at trial implicating Oglesby is similarly circumstantial. Agent Plummer testified about conversations he had with Terry and Oglesby concerning the purchase of a Mercedes Benz 300 SL in which it was indicated that Oglesby would have the car titled in his name. Agent Plummer also testified how a sham lease was discussed to make the transaction credible:
 
 
 11
 Kenny [Terry] explained to [Oglesby] that I was going to be able to put a lien on [the 300 SL] to show there was still a lien on the car and he was paying for the car and it will be a lease agreement also made up, so that it will reflect that Charles Oglesby could afford it because it would show that he was leasing it for for I think the price we agreed on was $400 a month so that way he would be able to afford it and be able to cover it through his job.
 
 
 12
 Agent Plummer later met with Oglesby, who signed the false lease agreement and executed the application for title. The title and false lease agreement, both bearing Oglesby's name, were introduced at trial.
 
 
 13
 Terry later decided to trade in the Mercedes Benz 300 SL for a Lexus, from which he was to receive $12,000. Agent Plummer testified to a conversation between Terry and Oglesby in which they requested Agent Plummer to give the $12,000 to Leon Ouwajit. Agent Plummer was told that Ouwajit had agreed to give Terry 500 milligrams of heroin, taking the $12,000 as a deposit. The initial part of the transaction, the trade-in, took place as planned, and the Lexus was placed in Oglesby's name.
 
 
 14
 This evidence was likewise sufficient to support the convictions of Oglesby. Terry's statement to Oglesby that the money resulting from the trade-in of the Mercedes Benz was to be used to purchase heroin imputes knowledge of the illegal drug conspiracy to Oglesby and indicates that he knew the "straw purchase" of the Lexus for Terry was part of a money laundering scheme designed to conceal drug proceeds. Oglesby nonetheless proceeded to assist Terry in trading the Mercedes on the Lexus, taking title to the Lexus in his name.
 
 II
 
 15
 More than three months following his conviction, Grant filed a motion for a new trial based on newly discovered evidence. He contended in his motion that he "had no knowledge that the critical dinner [at Pargo's on November 14, 1990] had been recorded and/or transcribed until his cross-examination of Hayward Walker on May 19, 1992 before the jury." In his motion Grant's counsel also asserted that the government misinformed him before trial that Grant's voice was heard on only one tape, a tape other than the one at issue in the motion. Grant argued that had the government not misled him, he would have discovered it and enhanced its quality before trial so that it could be used effectively at trial.
 
 
 16
 The district court denied the motion for new trial, finding that "the evidence in question [the tape] was known and available to [Grant] prior to the completion of his trial," and therefore was "not newly discovered within the meaning of Rule 33 of [the Federal Rules of Criminal Procedure]." The court also rejected the argument that the government misrepresentation adversely affected him. The court reasoned that even if Grant's allegations were true, the fact remained that Grant subsequently learned of the tape's existence during the first day of trial and failed to act upon that knowledge until more than two months later.
 
 
 17
 On appeal, Grant contends that the government attorney "deliberately denied the defendant access to the transcript of the tape [of the November 14 meeting at Pargo's], even though she knew the information contained in the tape would serve to impeach an important government witness." The record, however, indicates otherwise. The tape recording was identified by the government as N-16A-D, and was included in the discovery package provided to the then-lead defense counsel on October 25, 1991, nearly seven months before trial. By letter dated April 26, 1992, the government informed Grant's present counsel that, "[t]o assure that each attorney has had access to all discovery materials in this case[,] the government is making available to you to review, if you wish, a master copy of the discovery. Please contact my office to schedule an appointment for either the afternoon of May 4th or 5th, 1992."
 
 
 18
 Even if Grant can maintain that he did not "discover" the tape recording until trial, it cannot be characterized as evidence that was "newly discovered" following the trial. Grant was made aware of its existence on the first day of the trial, but made no effort to obtain the transcript or continue the trial until he had an opportunity to review it. Evidence is not "newly discovered" for purposes of Federal Rule of Criminal Procedure 33 when it was known or could have been known by the diligence of the defendant or his counsel. See United States v. Bales, 813 F.2d 1289, 1295 (4th Cir. 1987). We find no error in the district court's ruling denying Grant's motion for a new trial.
 
 III
 
 19
 Finally, Oglesby contends that evidence of other bad acts was improperly admitted against him at trial under Federal Rule of Evidence 404(b). Following cross-examination of Agent Plummer, the district court admitted evidence of Oglesby's prior participation in three automobile transactions, after determining that its probative value outweighed its prejudicial effect. Oglesby contends admitting the evidence was arbitrary and capricious. We disagree.
 
 
 20
 Oglesby's defense at trial rested principally on his position that he did not know that the "straw purchases" of the automobiles of which he was involved were designed to launder drug money. By making such an argument, Oglesby placed at issue his intent, which Rule 404(b) allows to be established by evidence of other acts. See United States v. Mark, 943 F.2d 444, 448 (4th Cir. 1991) (evidence admitted under Rule 404(b) to support the government's contention that the defendant was not an innocent friend of his codefendants but rather was engaged in illegal activity); United States v. King, 768 F.2d 586, 588 (4th Cir. 1985) (evidence of defendant's prior convictions for illegal behavior similar to that for which he was on trial was admissible because it made it more likely that the defendant intended to again engage in such behavior and was not an innocent friend caught in the wrong place at the wrong time, as the defendant had alleged). Accordingly, we find no abuse of discretion by the district court in admitting the evidence.
 
 
 21
 For the reasons given, we affirm.
 
 AFFIRMED